**CHICAGO TITLE INSURANCE CO.**

v.

**LEXINGTON & CONCORD SEARCH AND ABSTRACT, LLC, et al.**

Civ. A. No. 06–2177.

United States District Court, E.D. Pennsylvania.

April 13, 2007.

Francis X. Crowley, Mark L. Rhoades,
Blank Rome Comisky & McCauley, LLP,

Philadelphia, PA, for Chicago Title Insurance Co.

Christopher P. Leise, Michelle D. Coburn, Richard Hans Maurer, White & Williams LLP, Douglas E. Herman, Marshall Dennehey, Philadelphia, PA, Thomas J. O'Malley, Media, PA, for Lexington & Concord Search and Abstract, LLC, Glenn Randall, Diane Smith and Lexicon Property Services, Inc.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This case involves a dispute in the title insurance industry. The plaintiff, Chicago Title Insurance Co. ("Chicago Title"), is a title insurance underwriter that issues policies of title insurance to homeowners and lenders. Defendant Lexington & Concord Search and Abstract, LLC ("Lexington"), is a former title policy issuing agent for Chicago Title; defendant Glenn Randall ("Randall") was the principal and licensed agent responsible for Lexington; defendant Diane Smith ("Smith"), Randall's mother, was an employee of Lexington who became involved in managing the company in 2004; and defendants Lexicon Property Services, Inc. ("Lexicon"), and White Stone Search and Abstract, Inc. ("White Stone"), are other title issuing agencies that had relationships with Lexington, Randall, and Smith.

On January 30, 2003, Chicago Title and Lexington entered into a contract under which Chicago Title appointed Lexington as a non-exclusive policy issuing agent in Pennsylvania. The agreement was amended on June 4, 2004, to appoint Lexington as a non-exclusive policy issuing agent for Chicago Title in New Jersey. The plaintiff claims that (i) Lexington has breached this agreement, (ii) Lexington, Smith, and Randall have committed various intentional and unintentional torts against Chicago Title, and (iii) Lexicon and White Stone are liable as the successors in interest to Lexington. The plaintiff has moved for entry of a preliminary injunction against defendants Lexington, Randall, Smith, and Lexicon. The Court will grant the motion as to Lexington, Randall, and Lexicon and deny it as to Smith.

## I. PROCEDURAL HISTORY

The plaintiff filed its complaint on May 23, 2006. In the complaint, the plaintiff alleged breach of contract, as well as various intentional and unintentional tort claims.[1] The plaintiff further alleged that Lexicon and White Stone are liable to Chicago Title as successors in interest to Lexington and that Smith and Randall are liable to Chicago Title as alter egos of Lexington.

On the same day the complaint was filed, the plaintiff moved for entry of a temporary restraining order and preliminary injunction. After lengthy negotiations, the parties agreed to the entry of a stipulated order, which was entered by the Court on June 28, 2006. Under the order, defendants Lexington, Randall, Smith, and Lexicon were required, among other things, to refrain from transferring any assets valued in excess of $5,000 without prior notice to the Court and to Chicago Title for a period of 180 days from the entry of the order. This prohibition on the transfer of assets would renew automatically for successive 180-day periods, unless any of the stipulating defendants gave written notice to counsel for Chicago Title and to the Court of an intent to terminate the prohibition. On October 26, 2006, the

---

**1.** The complaint included the following claims: breach of contract, breach of fiduciary duty, conversion, negligence, unjust enrichment, conspiracy, fraud, negligent misrepresentation, and tortious interference with contract.

stipulating defendants filed a motion to vacate the stipulated order, and five days later, the court held a hearing on the motion. At the hearing, Randall, Smith, and Lexington proceeded pro se, and Lexicon was represented by counsel. After the hearing, the Court denied the motion to vacate but deemed it an objection to the stipulated order's limitation on the transfer of assets, which was scheduled to expire on December 26, 2006.

On December 9, 2006, the plaintiff filed the present motion for preliminary injunction. In its motion, the plaintiff asks the Court to continue the protections of the stipulated order, including its prohibition on selling, disposing, or transferring assets in excess of $5,000. The stipulating defendants filed their opposition on December 26, 2006.

The Court held a hearing on the motion on January 9, 2007. After the hearing, the Court ordered the plaintiff to submit additional legal support for its motion with regard to defendants Smith and Lexicon. The Court also specified that the stipulated order would remain in effect until the court decided the motion. The plaintiff submitted its additional legal support on January 16, 2007. Upon receipt of the plaintiff's submission, the Court afforded the stipulating defendants fourteen days to respond. Pro se defendants Lexington, Randall, and Smith submitted their response on January 26, 2007. Lexicon submitted its response on February 6, 2007.

On March 7, 2007, the Court once again ordered the plaintiff to submit additional legal support for its motion with regard to defendant Smith. The plaintiff submitted this additional legal support on March 19, 2007. On the same day, the Court received notices of appearance by counsel on behalf of Randall, Smith, and Lexington. Counsel for these defendants immediately requested an opportunity to file a response to the plaintiff's additional legal support. The Court granted the request. The defendants filed their response on March 29, 2007, and the plaintiff filed its reply to this submission on April 4, 2007.

## II. FINDINGS OF FACT[2]

### A. The Parties

(1) Chicago Title is a title insurance underwriter that issues policies of title insurance to homeowners and lenders. To assist in the conduct of its business, Chicago Title appoints limited, non-exclusive policy issuing agents pursuant to the terms and conditions of written issuing agency agreements. Tschappat Aff. ¶¶ 3, 5.[3]

(2) Lexington is a former title policy issuing agent for Chicago Title. Opp. to Mot. for Prelim. Inj. ¶ 3.

(3) Randall is a licensed attorney and title agent. He was the owner and president of both Lexington and Lexicon. He was also Lexington's principal, and he was the licensed agent responsible for the company. Tr. at 8;[4] Opp. to Mot. for Prelim. Inj. ¶ 3.

---

**2.** In making findings of fact, the Court has made no determination as to whether the testimony of Eric Senders ("Senders") at the January 9, 2007, hearing should be believed or disbelieved. The Court is aware that his testimony directly contradicts certain aspects of the testimony offered by Smith and Randall at that hearing. The Court does not believe that it must resolve this dispute at this stage of the litigation because (i) Senders' testimony, for the most part, is not relevant to the present motion, and (ii) Senders' testimony relates mostly to Randall, who has agreed to have the injunction entered against him.

**3.** The affidavit of Timothy Tschappat is attached to the plaintiff's motion for preliminary injunction as Exhibit D and cited herein as "Tschappat Aff.¶ __."

**4.** The transcript of the Court's January 9, 2007, hearing on the plaintiff's motion for

(4) Smith, Randall's mother, was a school psychologist for thirty years. She began working at Lexington on a part-time basis in February of 2004 and eventually began to work for the company on a full-time basis in July of 2004. Tr. at 71; Opp. to Mot. for Prelim. Inj. ¶ 3.

(5) Lexicon was incorporated by Randall in November of 2005 and began operations in April of 2006. Lexicon's stated purpose was to become a full-service real estate company that could offer a wide variety of services, including real estate brokerage, mortgage brokerage, property and casualty insurance sales, title insurance issuance, and limited transactional attorney services. Despite this stated purpose, Lexicon has engaged solely in services related to title insurance. Tr. at 50–52, 60–64, 190.

(6) White Stone is a mortgage brokerage/title insurance company owned by Nabil Ajaj ("Ajaj") and Hamdi Ibrahim ("Ibrahim"), mortgage brokers with whom Randall had become friendly. Randall worked as a title agent at White Stone from February to April of 2006. Tr. at 192–95.

### B. *The Agency Agreement*

(7) On January 30, 2003, Chicago Title and Lexington entered into an agreement ("Agency Agreement"), which appointed Lexington as a non-exclusive policy issuing agent for Chicago Title in Pennsylvania. Agency Agmt. ¶ 1.[5]

(8) The Agency Agreement was amended on June 4, 2004, to appoint Lexington as a non-exclusive policy issuing agent for

Chicago Title in New Jersey. Agency Agmt. Amend. ¶ 1.[6]

(9) Under paragraph four of the Agency Agreement, Lexington was required to (i) process applications for title insurance in a timely, prudent, and ethical fashion, and (ii) supply qualified personnel for conducting business pursuant to the agreement. Agency Agm. ¶ 4.

(10) Also under paragraph four of the Agency Agreement, when Lexington closed real estate transactions and received and disbursed funds of others, Lexington was required to (i) maintain separate from Lexington's personal or operating accounts all funds received by Lexington from any source in connection with the transactions in which Chicago Title's insurance was involved, (ii) disburse funds only for purposes for which they were entrusted, (iii) maintain an escrow ledger for each title insurance order involving fiduciary funds, which ledger shall separately reflect the escrow activity for each order, (iv) maintain a control account showing total fiduciary liability for escrow bank account, and (v) reconcile monthly the control account and ledger records to the monthly bank statement. Agency Agmt. ¶ 4.

### C. *Lexington's Tenure as a Title Policy Issuing Agent for Chicago Title*

#### 1. *Lexington's Personnel and Their Responsibilities*

(11) Lexington began operations as a title policy issuing agent for Chicago Title in February of 2003. At first, Lexington was operated solely by Randall, who was

---

preliminary injunction is cited herein as "Tr. at __."

**5.** The Agency Agreement is attached to the plaintiff's motion for preliminary injunction as Exhibit A and cited herein as "Agency Agmt. ¶ __."

**6.** The June 4, 2004, amendment to the Agency Agreement is attached to the plaintiff's motion for preliminary injunction as Exhibit B and cited herein as "Agency Agmt. Amend. ¶ __."

closing two to three real estate transactions per month. In July of 2003, however, business increased to about ten closings per month. As a solo practitioner, Randall was soon overwhelmed by the increased workload. Ex. 2 at 2.[7]

(12) Randall responded to the increased workload by hiring additional employees. Many of the employees who Randall hired had little or no experience in the title insurance industry. Randall therefore trained each employee himself. After training these employees, Randall entrusted several of them to conduct closings by themselves. Ex. 2 at 3.

(13) At first, Randall retained control over all disbursements from Lexington's escrow account and produced all closing settlement sheets, known as HUD–1's, himself. As the business continued to grow, however, Randall entrusted several of his employees, known as closers, to make disbursements from Lexington's escrow account and to produce their own HUD–1's. Randall admits that this increased reliance on his closers amounted to a loss of control over the business. Ex. 2 at 3; Tr. at 13, 18.

(14) In April of 2004, at the behest of Chicago Title, Randall hired Lisa Vetter ("Vetter") as a reconciler. As a reconciler, Vetter would review the escrow account to make sure that the overall account was balanced and that each time a real estate transaction was closed, the cash inflows matched the cash outflows. At the end of each month, Vetter reported that the account was balanced and provided Smith with a file that contained the reconciliation information she had gathered. Smith never reviewed these files. Tr. at 70–73; Ex. 2 at 3; Smith Dep. at 68–70.

(15) In February of 2004, Smith began working at Lexington on a part-time basis to help Randall cope with the increased workload. At first, Smith worked evenings and weekends, helping Randall with payroll software and accounts payable. After seeing that Lexington was having severe problems coping with the increased business, however, Smith took a sabbatical from her job as a school psychologist and went to work at Lexington on a full-time basis. By November of 2004, Smith had assumed responsibility for the day-to-day management of the company. Opp. to Mot. for Prelim. Inj. ¶ 3; Smith Dep. at 80–81.[8]

(16) Smith's responsibilities included managing employees, handling accounts payable, making bank deposits, reviewing closed files to check for errors, overseeing the operating account, reviewing the reports of the reconciler, and moving money from certain accounts into the escrow account and back again as needed. From at least June of 2004 until Lexington ceased operations, Smith was authorized to sign on all Lexington accounts, including the escrow account. In December of 2005, Smith took over sole management of Lexington's escrow account. Res. to Pl. Add'l Br. in Supp. of Mot. for Prelim. Inj. at 2–4; Smith Dep. at 33, 76–77; Ex. 1 No. 23;[9]

7. A copy of a web log response posted by reviewed by Randall entitled "The True Lexington Story" was submitted by the plaintiff during the hearing as Exhibit 2 and is cited herein as "Ex. Smith and Concord January 9, 2007, 2 at __."

8. Excerpts from Smith's deposition are attached to the plaintiff's motion for preliminary injunction as Exhibit F and to Smith's supplemental brief in support of an order vacating the stipulated order as Exhibit A. Smith's deposition is cited herein as "Smith Dep. at __."

9. A copy of Smith and Randall's responses to interrogatories was submitted by the plaintiff during the January 9, 2007, hearing and is cited herein as "Ex. 1 No. __."

Randall Dep. at 56.[10]

(17) Smith knew that title insurance agents maintain escrow accounts for the purpose of holding the funds of others in trust until a real estate transaction closed, at which time the funds must be disbursed to the appropriate parties. Smith also knew that escrow funds were segregated from other funds that Lexington received. Smith Dep. at 76–79, 84.

### 2. Problems with Lexington's Escrow Account

(18) In April of 2005, Vetter informed Lexington that there were problems with the escrow account. Vetter was subsequently discharged. Ex. 2 at 3.

(19) Lexington hired a new reconciler in April of 2005. Upon review of the escrow account, the new reconciler discovered that when real estate transactions were closed, some individuals had been paid twice, payments were made to fictitious companies, deposits were recorded that were never received, money that should have been collected was not collected, required forms were not signed, liens were not paid, payoffs were wrong, and checks were written directly from the escrow account that were not recorded on HUD–1's. These irregularities led to large deficits in Lexington's escrow account. Tr. at 14–16.

(20) Over the next few months, Smith looked through each file, attempting to discover where the discrepancies occurred and what caused them. As she discovered each irregularity, she instructed her lawyer to write a letter to the individual who received an erroneous payment. The letter would communicate to the individual what had happened and what the individual owed to Lexington. Some individuals

returned the erroneous payments, but most ignored the letters. Smith Dep. at 72–73.

(21) In July of 2005, Smith informed Chicago Title that there were significant deficits in Lexington's escrow account. Smith Dep. at 75; Ex. 2 at 3.

(22) In an attempt to avoid default, Randall and Smith began depositing their own personal funds into the escrow account in late 2005. At that time, Randall deposited $75,000 into Lexington's escrow account, and Smith deposited $163,000 into the account. Ex. 2 at 3; Tr. at 203.

(23) Also in late 2005, Smith began to transfer money from Lexington's escrow account to its operating account and back again in an attempt to meet the various obligations of the company. Smith Dep. at 83.

(24) On February 9, 2006, Chicago Title dispatched a team to review Lexington's records. This review continued until February 10, 2006. On the day this review ended, Chicago Title terminated the Agency Agreement. Ex. 2 at 3.

(25) Once Chicago Title terminated the Agency Agreement, Lexington could no longer do closings for Chicago Title, and consequently, money stopped flowing into Lexington's escrow account. Tr. at 69.

(26) In an attempt to avoid default, Smith deposited another $250,000 of her personal assets into Lexington's escrow account in March of 2006. The escrow account nevertheless fell into default soon after. Lexington's accounts now have zero balances. Ex. 2 at 3; Tr. at 17, 57.

(27) Because of shortfalls in the escrow accounts, several checks written by Lexington as part of real estate settlements

---

10. Excerpts from Randall's deposition are attached to the plaintiff's supplemental memorandum of law in further support of the motion of plaintiff for preliminary injunction as Ex. B and cited herein as "Randall Dep. at __."

have already been, or in the future will be, dishonored. Claims have therefore been brought or will be brought against Chicago Title by prior lenders whose mortgages were not satisfied as a result of the Lexington escrow account default. Chicago Title has already paid or is in the process of paying approximately $500,000 in claims, and it expects to pay much more. Tschappat Aff. ¶ 15; Mot. for Prelim. Inj. at ¶ 13.

(28) Since Lexington was shut down, Randall and Smith have initiated numerous lawsuits to recover money that was improperly disbursed from the company's escrow account. Randall and Smith have turned over to Chicago Title almost $100,000 in damages awards that they have recovered as a result of these suits. Opp. to Mot. for Prelim. Inj. ¶ 13(c).

D. *Randall and Smith's Continued Involvement in the Title Insurance Industry*

1. *The White Stone Period*

(29) After Chicago Title terminated the Agency Agreement on February 10, 2006, Lexington lost its only underwriter and consequently ceased operations. To earn a living, Randall helped two mortgage brokers, Ajaj and Ibrahim, open their own title company, White Stone. By the time Randall became involved with White Stone, it had already obtained an underwriter and was ready to begin operations. Randall therefore sold all of Lexington's used furniture and computers to White Stone for $5,000, installed White Stone's software on the computers, and launched White Stone from Lexington's office. Randall worked under White Stone from February to April of 2006. Tr. at 192–95.

2. *The Lexicon Period*

(30) In November of 2005, Randall incorporated Lexicon. Randall is Lexicon's sole shareholder. At the time of its incorporation, Randall and Smith opened escrow and operating accounts on behalf of Lexicon using funds that were withdrawn from Lexington's operating account. Tr. at 51, 198–99.

(31) Lexicon's stated purpose was to become a full-service real estate company that could offer a wide variety of services, including real estate brokerage, mortgage brokerage, property and casualty insurance sales, title insurance issuance, and limited transactional attorney services. Tr. at 62, 190.

(32) Lexicon did not conduct any operations while Lexington was in existence. Once Lexington ceased operations, Randall immediately started seeking an underwriter for Lexicon. In April of 2006, Randall obtained an underwriter for Lexicon, and Lexicon accordingly began operations. Tr. 193–195.

(33) When Lexicon began operations, the company's client base consisted of only those referral sources that had previously referred business to Lexington. Lexicon also worked out of Lexington's offices, had the same telephone number as Lexington, and used Lexington's old furniture and computers, which Lexicon received from White Stone free-of-charge. Smith's role at Lexicon was exactly the same as her role at Lexington, and Lexicon's other employees were all former employees of Lexington. Tr. at 52–57, 204, 208; Smith Dep. at 207.

(34) One of the reasons why Lexicon maintained Lexington's telephone number was to help those who had been injured by the escrow deficits that occurred at Lexington. When these aggrieved individuals called Lexicon, Smith would perform work on Lexington files. Tr. at 205–06.

(35) Although Lexicon's stated purpose was to become a full-service real estate

company, Lexicon's operations consisted solely of title insurance work. Tr. at 64.

(36) Sometime between April and June of 2006, Lexicon served as the title agent for the attempted sale of Smith's home on Wheatsheaf Lane. In connection with the attempted sale, money that was earmarked for the purchaser's mortgage was transferred by Assured Lending into Lexicon's escrow account. On the day of the closing, the purchaser did not produce a payment of $48,000 that was necessary to close the transaction, and the closing was not completed. Smith nevertheless caused Lexicon to disburse the funds that were earmarked for the purchaser's mortgage to the seller of a home that Smith had previously purchased on Meadowlark Lane. Tr. at 80–88.

(37) As a result of Lexicon's improper disbursement of escrow funds in connection with the attempted sale of Smith's home, Lexicon's title insurance underwriter terminated its agreement with the corporation and commenced a lawsuit. Lexicon's former underwriter has obtained a freeze on Lexicon's assets, pending the resolution of its lawsuit. Lexicon's assets consist of approximately $100,000 held in its escrow account. Tr. at 98, 195–96.

### E. *The Stipulated Order and Conduct Thereafter*

(38) On June 28, 2006, upon agreement between the plaintiff and defendants Lexington, Randall, Smith, and Lexicon ("Stipulating Defendants"), the Court entered a stipulated order. Under the order, defendants Lexington, Randall, Smith, and Lexicon were required, among other things, to refrain from transferring any assets valued in excess of $5,000 without prior notice to the Court and to Chicago Title for a period of 180 days from the entry of the

order. This prohibition on the transfer of assets would renew automatically for successive 180–day periods, unless any of the stipulating defendants gave written notice to counsel for Chicago Title and to the Court of an intent to terminate the prohibition. Stip. Order.[11]

(39) In early October of 2006, Smith liquidated $18,000 of stocks in a brokerage account and used the proceeds to pay various bill she had incurred. Smith did not notify the Court or Chicago Title of this transaction. Tr. at 75–77; Smith Dep. at 134–37.

### III. *ANALYSIS*

The plaintiff has moved for entry of a preliminary injunction against defendants Lexington, Randall, Smith, and Lexicon based on its claims of (i) breach of contract, (ii) breach of fiduciary duty, (iii) conversion, (iv) negligence, (v) unjust enrichment, and (vi) conspiracy. At the January 9, 2007, hearing on the motion, Randall agreed to have the preliminary injunction entered against him. The Court will therefore address the motion only insofar as it applies to Lexington, Smith, and Lexicon. The Court will grant the motion with regard to Lexington and Lexicon, but it will not grant the motion with regard to Smith.

The standard for evaluating a motion for preliminary injunction consists of a four-part inquiry: (i) whether the movant has shown a reasonable probability of success on the merits; (ii) whether the movant will be irreparably injured by denial of the relief; (iii) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (iv) whether granting the preliminary relief will be in the public interest. *United States v. Bell,*

---

11. A copy of the June 28, 2006, stipulated order was submitted by the plaintiff during the January 9, 2007, hearing as Exhibit 9 and is cited herein as "Stip. Order."

414 F.3d 474 (3d Cir.2005). The movant bears the burden of establishing every element in its favor. *See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).

## A. *Reasonable Probability of Success on the Merits*

The Court finds that the plaintiff has demonstrated a reasonable probability of success on the merits of its breach of contract claim against Lexington and its claim of successor liability against Lexicon. The Court also finds that the plaintiff has demonstrated a reasonable probability of success on the merits of its breach of fiduciary duty claim against Smith. Because a reasonable probability of success on the merits of the above-mentioned claims is sufficient to support entry of the proposed preliminary injunction against Lexington, Lexicon, and Smith, the Court will not address the merits of the plaintiff's claims of conversion, negligence, unjust enrichment, or conspiracy.

### 1. *Breach of Contract*

### a. *Direct Claim Against Lexington*

The plaintiff argues that Lexington breached the Agency Agreement by operating in a negligent and non-professional manner. Lexington does not challenge the validity of the Agency Agreement. Lexington argues instead that it has not breached the Agency Agreement because it has explained the reasons for the shortfalls in the escrow account and because losses are no longer increasing. The Court is not persuaded by Lexington's arguments.

■ Under Pennsylvania law, a plaintiff who alleges breach of contract must demonstrate (i) the existence of a contract, including its essential terms, (ii) a breach of a duty imposed by the contract, and (iii) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir.2003).

■ In the present case, Chicago Title has provided the Agency Agreement, which governed the relationship between Chicago Title and Lexington. Under paragraph four of the Agency Agreement, Lexington was required to process applications for title insurance in a timely, prudent, and ethical fashion. Furthermore, when Lexington received and disbursed funds of others in connection with real estate transaction closings, the Agency Agreement required Lexington to (i) maintain separate from Lexington's personal or operating accounts all funds received by Lexington from any source in connection with transactions in which Chicago Title's insurance was involved, and (ii) disburse funds only for purposes for which they were entrusted. Agency Agmt. ¶ 4.

Despite these provisions, Lexington did not process applications for title insurance in a timely, prudent, and ethical fashion. Lexington's management admittedly lost control of the corporation as it began to grow at an accelerated rate. Ex. 2 at 3. When receiving and disbursing funds of others in connection with closings, Lexington paid some clients twice, made payments to fictitious companies, recorded deposits that were never received, failed to collect money that should have been collected, failed to sign required forms, failed to pay liens, and made erroneous payoffs. Tr. at 14–16. Randall and Smith also admitted to commingling their personal funds with those of others in Lexington's escrow account. Tr. at 16–17. As a result of these breaches of the Agency Agreement, Chicago Title has already paid or is in the process of paying approximately $500,000 in claims, and it expects to pay much more. Tschappat Aff. ¶ 15; Mot. for Prelim. Inj. at ¶ 13.

The plaintiff has therefore demonstrated that it has a reasonable probability of success on the merits of its breach of contract claim against Lexington.

b. *Successor Liability Claim Against Lexicon*

The plaintiff argues that because the operations of Lexicon were identical to the operations of Lexington, the Court should hold Lexicon responsible for Lexington's debts and obligations under the de facto merger doctrine. Lexicon responds by arguing that the Court should follow the general rule that a successor does not acquire the debts and liabilities of its predecessor. The Court finds that the plaintiff has demonstrated a reasonable probability of success on the merits of this claim.

■ Under Pennsylvania law, "when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property." *Cont'l Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 873 A.2d 1286, 1291 (2005). This general rule of non-liability can be overcome, however, if (i) the purchaser expressly or implicitly agreed to assume liability, (ii) the transaction amounted to a de facto merger, (iii) the purchasing corporation was merely a continuation of the selling corporation, (iv) the transaction was fraudulently entered into to escape liability, or (v) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation. *See id.* Courts analyze the second and third exceptions—"de facto merger" and "mere continuation"— identically. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 468 (3d Cir. 2006).

■ To determine whether a de facto merger or a mere continuation has oc-curred, courts consider four factors: (i) continuity of ownership; (ii) cessation of ordinary business by, and dissolution of, the predecessor as soon as practicable; (iii) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of business; and (iv) continuity of management, personnel, physical location, and general business operation. *Commonwealth v. Lavelle*, 382 Pa.Super. 356, 555 A.2d 218, 227 (1989). All four factors need not be present for a court to find that a de facto merger has occurred. *Id.*

■ The continuity-of-ownership factor helps courts identify situations where shareholders of a corporation unfairly attempt to retain assets that have been artificially cleansed of liability. *Berg Chilling Sys.*, 435 F.3d at 469. Here, Randall was the sole owner of both Lexington and Lexicon. Tr. at 8. This factor therefore weighs in favor of finding that a de facto merger occurred.

The second factor, cessation of ordinary business by, and dissolution of, the predecessor, ensures that an essential characteristic of a merger is present: survival of the successor corporation and termination of the predecessor corporation. *See id.* at 470. The predecessor corporation need not actually dissolve; reduction to an assetless shell is sufficient. *See Lavelle*, 555 A.2d at 228. Here, Lexington ceased doing business immediately after Chicago Title terminated the Agency Agreement, and although Lexington has not been dissolved, it has been reduced to an assetless shell. Tr. at 17, 57; Ex. 2 at 3. This factor therefore weighs in favor of finding that a de facto merger occurred.

The third factor requires courts to examine whether the successor corporation assumed the liabilities of the predecessor that are ordinarily necessary for the unin-

terrupted continuation of normal business operations. *Berg Chilling Sys.*, 435 F.3d at 470. Here, Lexicon did not assume the liabilities of Lexington nor did it continue operations in an uninterrupted manner. Lexicon did not even begin operations until two months after Lexington was shut down. Tr. at 192–95. This factor therefore weighs in favor of finding that a de facto merger did not occur.

The fourth factor requires courts to determine whether the successor corporation "continued the enterprise" of the predecessor corporation. *Id.* at 469. Courts accomplish this task by examining whether there is a continuity of management, personnel, physical location, assets, and general business operations between the two corporations. *Id.* Here, Randall was the president and Smith managed the day-to-day operations of both Lexington and Lexicon. All of Lexicon's employees were former employees of Lexington, and Lexicon operated out of Lexington's previous office, using Lexington's old computer equipment and office furniture. Lexicon even retained Lexington's telephone number. Although Lexicon had a stated purpose of becoming a full-service real estate company, it engaged solely in title insurance work, which was the exact same line of business in which Lexington had previously engaged. And finally, Lexicon's client base consisted of only those referral sources that had previously referred business to Lexington. Tr. at 52–57, 204, 208; Smith Dep. at 207. This factor therefore weighs in favor of finding that a de facto merger occurred.

Because three of the four factors weigh in favor of finding that a de facto merger occurred between Lexington and Lexicon,

the Court finds that the plaintiff has a reasonable probability of success on the merits of its successor liability claim against Lexicon. The single factor that weighs against finding that a de facto merger occurred—assumption of the liabilities ordinarily necessary for the uninterrupted continuation of business—is mitigated by the fact that Randall would have continued operations as a title insurance agent in an uninterrupted fashion but for his inability to obtain an underwriter for Lexicon immediately after Lexington ceased doing business. Tr. at 193–95. Indeed, although Lexicon did not formally assume the liabilities ordinarily necessary for the uninterrupted continuation of business, Smith has conceded that one of the reasons for retaining Lexington's telephone number was to talk with and help prior clients of Lexington who were aggrieved by Lexington's escrow shortfalls. Tr. at 205–06.

### 2. *Breach of Fiduciary Duty*

The plaintiff argues that Smith is liable for aiding and abetting breach of fiduciary duty [12] because she assisted Randall in breaching certain fiduciary duties that he owed to Chicago Title. Smith responds by arguing that she simply attempted to rectify the problems that had developed with Lexington's escrow account. The Court finds that the plaintiff has demonstrated a reasonable probability of success on the merits of this claim.

### a. *Whether the Pennsylvania Supreme Court Would Recognize a Claim of Aiding and Abetting Breach of Fiduciary Duty*

As a threshold matter, Smith argues that the plaintiff cannot succeed on

---

12. Although the plaintiff did not include a specific allegation of aiding and abetting breach of fiduciary duty in its complaint, the plaintiff argues that this claim is included in its allegation of breach of fiduciary duty. Because Smith does not dispute this argument, the Court will accept the plaintiff's contention for purposes of deciding the motion.

its allegation of aiding and abetting breach of fiduciary duty because the Pennsylvania Supreme Court has not yet recognized such a claim.

When the Pennsylvania Supreme Court has not spoken on an issue, a federal court sitting in diversity must predict how the state high court would rule. *See Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir.1991). In making this prediction, proper regard must be given to the decisions of Pennsylvania's lower state courts. *See id.* (citing *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273–74 (3d Cir. 1985) ("Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indications that the highest state court would rule otherwise.")).

Lower Pennsylvania state courts have concluded that the Pennsylvania Supreme Court would recognize a claim for aiding and abetting breach of fiduciary duty. *See, e.g., Koken v. Steinberg*, 825 A.2d 723, 731–33 (Pa.Commw.Ct.2003). In *Koken,* the Commonwealth Court of Pennsylvania held that the plaintiff had stated a claim for aiding and abetting breach of fiduciary duty where the defendant's auditing and actuarial services allegedly allowed the former officers and directors of an insolvent insurer to "loot" the company. *See id.* at 725, 731–33. The court reached this decision after its examination of Pennsylvania Supreme Court and Superior Court decisions convinced the court that aiding and abetting breach of fiduciary duty, as described by section 876(b) of the Second Restatement of Torts, constituted a viable

cause of action in Pennsylvania. *See id.* at 731. No state court has questioned this decision, and at least one lower court has followed it. *See Lichtman v. Taufer,* No. 005560, 2004 WL 1632574, at *8 (Pa.Ct. Com.Pl. July 13, 2004).

The vast majority of district courts in this Circuit have reached the same conclusion. *See, e.g., Reis v. Barley, Snyder, Senft & Cohen, LLC,* No. 05–CV–01651, 2007 WL 960046, at *11 (E.D.Pa. Mar.30, 2007) (recognizing a claim of aiding and abetting breach of fiduciary duty); *see also Adena, Inc. v. Cohn,* 162 F.Supp.2d 351, 357–58 (E.D.Pa.2001) (same); *see also Stone St. Serv., Inc. v. Daniels,* No. CIV.A. 00–1904, 2000 WL 1909373, at *3 (E.D.Pa. Dec.29, 2000) (same); *see also Pierce v. Rossetta Corp.,* CIV.A. No. 88–5873, 1992 WL 165817, at *6–*9 (E.D.Pa. June 12, 1992) (same); *but see Flood v. Makowski,* CIV.A. No. 3–cv–03–1803, 2004 WL 1908221, at *36 (M.D.Pa. Aug.24, 2004) (refusing to recognize a claim for aiding and abetting breach of fiduciary duty but noting that the Eastern District of Pennsylvania has uniformly recognized such a claim).[13]

After reviewing all relevant precedent, the Court is persuaded that the Pennsylvania Supreme Court would recognize the tort of aiding and abetting breach of fiduciary duty. Prior to *Koken,* where the Commonwealth Court of Pennsylvania expressly recognized the cause of action, the Superior Court of Pennsylvania has twice discussed aiding and abetting under section 876(b) of the Second Restatement of Torts favorably. *See Kline v. Ball,* 306 Pa.Super. 284, 452 A.2d 727, 728–29 (1982);

---

**13.** The Court could locate only two district court opinions, both from the Middle District of Pennsylvania, that refused to recognize a claim of aiding and abetting breach of fiduciary duty, and neither of these opinions actually examined Pennsylvania state law to pre-

dict how the Pennsylvania Supreme Court would rule. *See Flood,* 2004 WL 1908221, at *36; *see also Daniel Boone Area Sch. Dist. v. Lehman Bros.,* 187 F.Supp.2d 400, 413 (M.D.Pa.2002).

*see also Burnside v. Abbott Lab.*, 351 Pa.Super. 264, 505 A.2d 973, 982–83 (1985). Furthermore, after *Koken,* at least one lower state court has expressly recognized the tort. *See Lichtman,* 2004 WL 1632574, at *8. Having found no reason why the Pennsylvania Supreme Court would rule otherwise, the Court joins other courts in this district and finds that aiding and abetting breach of fiduciary duty constitutes a viable cause of action in Pennsylvania.

b. *Whether the Plaintiff Has Demonstrated a Reasonable Probability of Success on the Merits of its Aiding and Abetting Claim*

Smith argues that even if a claim of aiding and abetting breach of fiduciary duty exists in Pennsylvania, the plaintiff has failed to satisfy the essential elements of the tort.

■ A claim of aiding and abetting breach of fiduciary duty consists of three elements: (i) a breach of a fiduciary duty owed to another; (ii) knowledge of the breach by the aider and abettor; and (iii) substantial assistance or encouragement by the aider and abettor in effecting that breach. *Koken,* 825 A.2d at 732 (citing Restatement (Second) of Torts § 876(b) (1979)).

■ Smith does not dispute the plaintiff's argument that Randall was a fiduciary of Chicago Title or that Randall breached his fiduciary duties to Chicago Title by (i) failing to maintain escrow funds separately from operating funds, and (ii) failing to ensure that escrow funds were disbursed only for the purposes for which these funds were entrusted to him. Smith argues instead that the plaintiff has failed to demonstrate Smith's knowledge of, and substantial participation in, Randall's breaches of fiduciary duty. The Court finds that the plaintiff has demonstrated a reasonable probability of success on the merits of this claim.

The plaintiff has submitted sufficient evidence to demonstrate that Smith knew that Randall's conduct amounted to a breach of fiduciary duty. At her deposition, Smith admitted knowing that the escrow funds did not belong to Randall or to Lexington, but were instead held in trust for others, including Chicago Title. Smith also testified that she knew that operating funds were segregated from escrow funds and that the separate escrow account was maintained "[f]or the money that isn't ours that comes in to pay for a purchase or a refinance of a property. We take the money from, usually from a wire from a lender; we then go to the closing and disburse the money." Smith Dep. at 76. This evidence therefore indicates that Smith knew that Randall had breached his duties to the beneficiaries of the escrow funds when he failed to maintain the funds separately from operating funds and failed to ensure that these funds were disbursed only for the purposes for which they were entrusted to him.

The plaintiff has also submitted sufficient evidence to demonstrate that Smith substantially assisted Randall in effecting his breach of fiduciary duty. Smith acknowledges that, in an attempt to "keep everything afloat," she was the one who actually transferred funds from the escrow account to the operating account. Smith Dep. at 83. Smith also acknowledges that from November of 2004 until Lexington ceased operations, she was responsible for the day-to-day management of the company. Opp. to Mot. for Prelim. Inj. ¶ 3. As part of her duties, Smith was required to review the reconciliation reports that came back from the reconcilers. Randall Dep. at 56. Despite this duty, Smith never reviewed the reconciliation reports. Smith Dep. at 68–69.

The Court accordingly finds that the plaintiff has demonstrated a reasonable probability of success on the merits of its aiding and abetting fiduciary duty claim against Smith.

### B. *Irreparable Harm*

The plaintiff argues that it will suffer irreparable harm if the protections of the stipulated order are not continued because the funds available to satisfy a judgment in this case will likely be dissipated. The defendants respond by arguing that the plaintiff will not suffer irreparable harm because they possess errors and omissions insurance policies and because the plaintiff has an adequate remedy at law. The Court finds that the plaintiff has demonstrated that it will suffer irreparable harm absent the continuation of the stipulated order's protections with regard to Lexington and Lexicon. The Court is not persuaded, however, that continuation of the stipulated order with regard to defendant Smith is necessary to avoid such harm.

■ To obtain injunctive relief, the plaintiff must make a clear showing of "immediate irreparable injury" or a "presently existing actual threat." *Acierno v. New Castle County*, 40 F.3d 645, 655 (3d Cir.1994). As such, the plaintiff must demonstrate that, absent the issuance of a preliminary injunction, the plaintiff will suffer harm that cannot be sufficiently redressed following a trial on the matter. *See id.* at 653. In other words, the preliminary injunction must be the only way of protecting the plaintiff from harm. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989).

■ The United States Court of Appeals for the Third Circuit has recognized that in certain situations a district court has the power to protect a future damages remedy through issuance of a preliminary injunction. *Elliott v. Kiesewetter*, 98 F.3d

47, 57 (3d Cir.1996) (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197 (3d Cir.1990)). As the court in *Hoxworth* explained, however, this type of injunction is not appropriate in "run-of-the-mill damages actions." *Hoxworth*, 903 F.2d at 197. To obtain such relief, the plaintiff must show not only that it is likely to become entitled to the encumbered funds upon final judgment, but also that without the preliminary injunction, the plaintiff will probably be unable to recover those funds. *See id.* The second *Hoxworth* requirement is essentially an irreparable harm inquiry. *Kiesewetter*, 98 F.3d at 57.

Applying these guidelines in *Hoxworth*, the court upheld the district court's finding that the plaintiff would suffer irreparable harm if a preliminary injunction encumbering the assets of a securities dealer were not entered. *Id.* at 206. The court reasoned that such an injunction was appropriate because the securities dealer's financial and legal problems, which included administrative proceedings in twenty four jurisdictions, were sufficient to render the corporation unlikely to be able to satisfy a judgment. *Id.* at 206. Conversely, the court found that entry of an injunction encumbering the assets of the dealer's president was not necessary to avoid irreparable harm to the plaintiff because there was no evidence that the president was consuming, dissipating, or fraudulently conveying his assets. *See id.*

Likewise, in *Kiesewetter*, the court held that "a party seeking an asset freeze to preserve a money judgment may show irreparable injury by showing that the freeze is necessary to prevent the consumption, dissipation or fraudulent conveyance of the assets that the party pursuing the asset freeze seeks to recover in the underlying litigation." *Kiesewetter*, 98 F.3d at 58. The court was careful to note,

however, that irreparable harm did not exist in every case in which a judgment would probably go unsatisfied absent an injunction. *Id.* at 58 n. 8. The court reasoned that such a rule would improperly allow plaintiffs to freeze a defendant's assets every time a plaintiff sued for an amount greater than the defendant's net worth. *See id.*

■ In the present case, the plaintiff has satisfied the irreparable harm guidelines set forth in *Hoxworth* for entry of a preliminary injunction encumbering the assets of defendants Lexington and Lexicon. Lexington has ceased operations; it has a zero balance in its accounts; and any money that flows into the corporation will immediately be subject to the claims of those who were injured by the default of the corporation's escrow account. Tr. at 16–17, 57. Lexicon has similarly ceased operations, and its only assets are currently encumbered by a court order obtained by its underwriter. Tr. at 196–96. Indeed, although both corporations possess errors and omissions insurance, the insurer has filed a declaratory judgment action that seeks to rescind both the Lexington and Lexicon insurance policies. *See Seneca Ins. Co. v. Lexington & Concord Search & Abstract,* No. 07–714, 2007 WL 856193 (E.D. Pa. filed Feb, 21, 2007).

■ The plaintiff has not, however, satisfied the irreparable harm guidelines set forth in *Hoxworth* for entry of a preliminary injunction encumbering the assets of defendant Smith. According to the plaintiff, if the stipulated order is not continued, Smith "will seek to dissipate and encumber her assets making them unavailable to Chicago Title to satisfy its claims against her and the other defendants." Pl. Second Add'l Br. in Supp. of Mot. for Prelim. Inj. at 8. The plaintiff substantiates this contention by pointing out (i) Smith's alleged violation of the stipulated order wherein she unilaterally liquidated an $18,000 brokerage account to pay bills, and (ii) Smith's alleged misuse of escrow funds held at Lexicon to purchase her new home on Meadowlark Lane. The Court is not persuaded by this argument.

Although Smith's liquidation of the $18,000 brokerage account to pay bills is evidence that some of Smith's assets may be dissipated before this Court renders judgment, the Court does not believe that this conduct rises to the level of consuming, dissipating, or fraudulently conveying assets that *Hoxworth* and *Kiesewetter* indicated was necessary for a finding of irreparable harm. *See Kiesewetter,* 98 F.3d at 58. Smith's expenditure represents only a small portion of her net worth, which consists of $110,000 of equity in a beach home, $90,000 of equity in a vacation home in the Poconos, $120,000 of equity in two investment properties, two personal homes of unknown value, and various investment accounts, including a retirement account, of unknown value. Smith Dep. at 211–13. Furthermore, the plaintiff has submitted no evidence that Smith liquidated this account in order to avoid liability to the plaintiff or to otherwise make funds unavailable to satisfy a judgment rendered on behalf of the plaintiff.

The Court similarly finds that Smith's alleged misuse of escrow funds in connection with the purchase of her new home is insufficient to warrant entry of a preliminary injunction encumbering her assets. The defendant has submitted no evidence that this conduct is likely to result in a dissipation of assets that would otherwise be available to satisfy a judgment in this case. The simple allegation that Smith has engaged in activity that may subject her to civil liability is not the type of "presently existing actual threat" that courts look for when evaluating whether the plaintiff will suffer irreparable harm absent entry of a

preliminary injunction. *See Acierno,* 40 F.3d at 655.

Indeed, contrary to the plaintiff's argument, Smith has shown a willingness to help the plaintiff recover funds that Chicago Title lost in connection with the default of Lexington's escrow account. Not only did Smith deposit over $400,000 of her personal assets into Lexington's escrow account in a failed attempt to prevent it from defaulting, but she has also initiated numerous lawsuits in connection with events linked to Lexington's escrow shortfalls. Tr. at 203; Ex. 2 at 3. These lawsuits have resulted in a recovery of almost $100,000, which Smith has turned over to Chicago Title. Opp. to Mot. for Prelim. Inj. ¶ 13(c).[14]

### C. Harm to the Defendants[15]

■ In deciding whether injunctive relief is appropriate, the court must balance the hardships to the respective parties. *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir. 1990). The purpose behind this balancing analysis is to ensure that the issuance of an injunction would not harm the defendants more than a denial would harm the plaintiff. *Id.*

Lexington and Lexicon have submitted no evidence and do not argue that they will suffer harm if the Court continues the protections of the stipulated order. The Court therefore finds that the balance of equities favors Chicago Title.

### D. The Public Interest

The final consideration in the preliminary injunction analysis is whether the issuance of a preliminary injunction furthers the public interest. *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 807 (3d Cir.1998). The United States Court of Appeals for the Third Circuit has noted that as a practical matter, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir.1994).

Lexicon argues that issuance of the preliminary injunction would not serve the public interest because the corporation's assets are already encumbered by a court order. Lexicon supplies no law for this contention, and the Court is not persuaded by the argument. The Court finds instead that issuance of the preliminary injunction would not harm the public interest.

### E. Scope of the Injunction

■ Before issuing a preliminary injunction encumbering the assets of a defendant to protect a future money judgment, "the court must make some attempt reasonably to relate the value of the assets encumbered to the value of the expected judgment." *Hoxworth,* 903 F.2d at 199. In the present case, the plaintiff has demonstrated that it has suffered over $500,000 in damages as a result of deficits that developed in Lexington's escrow account. Tschappat Aff. ¶ 15; Mot. for Prel-

---

14. The Court has decided that the plaintiff has not demonstrated irreparable harm as to Smith on the record before it at the preliminary injunction hearing. The Court has received recently additional information from the plaintiff on this topic. The plaintiff may file a new motion based on recently disclosed information if it so desires.

15. Because the Court has determined that the plaintiff has failed to demonstrate that it will suffer irreparable harm if the stipulated order is not continued with respect to Smith, the Court will limit its discussion of the final two elements of the preliminary injunction inquiry to Lexington and Lexicon.

**322**

im. Inj. at ¶ 13. The combined assets of Lexington and Lexicon amount to approximately $100,000. Tr. at 98, 195–96. The Court therefore finds that the scope of the stipulated order, which would encumber all of the defendants' assets, is appropriate.

### F.  *Bond Requirement*

■ The applicant for a preliminary injunction must give security "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c) (2006). Although the amount of the bond is left to the discretion of the court, the posting requirement is not. *Hoxworth*, 903 F.2d at 210. Absent circumstances where there is no risk of harm to the defendant, failure to require a successful applicant to post a bond constitutes reversible error. *Id.*

In the present case, the Court finds that the risk of harm to the defendants by being wrongfully enjoined is minimal. Indeed, the Court is simply continuing an order that was the product of a voluntary agreement among the parties. The Court will therefore require the plaintiff to post a bond in the amount of $5,000 to compensate the defendants for costs they may incur if it is later determined that the injunction was improperly issued.[16]

An appropriate order follows.

### ORDER

AND NOW, this 13th day of April, 2007, upon consideration of the plaintiff's motion for preliminary injunction (Doc. No. 38), several briefs and letters in support of and in opposition to the motion, and after several telephone conferences and a hearing on the motion on January 9, 2007, IT IS HEREBY ORDERED that for the rea-

sons stated in a memorandum of today's date:

1. The plaintiff's motion for preliminary injunction is GRANTED IN PART and DENIED IN PART. To the extent the motion seeks to have the June 28, 2006, stipulated order remain in effect with respect to defendants Randall, Lexington, and Lexicon, the motion is GRANTED. To the extent the motion seeks to have the June 28, 2006, stipulated order remain in effect with respect to defendant Smith, the motion is DENIED.

2. On or before April 23, 2007, the plaintiff shall post bond in the amount of $5,000.00, or the injunction will be dissolved. The stipulated order shall remain in effect with regard to defendants Randall, Lexington, and Lexicon until April 23, 2007, or until the plaintiff has posted the bond, whichever is earlier. At that time, the preliminary injunction extending the protections of the stipulated order will take effect.

---

**16.** The Court did not receive arguments from the parties regarding the amount of the bond. If any party wishes to increase or decrease the amount of the bond, it is welcome to seek to do so by motion.